**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

NANCY LITTLE, individually and as
personal representative of the estate of
ROBERT L. RABE,

       Plaintiff,

v.

THE BUDD COMPANY,

       Defendant.

Case No. 16-4170-DDC-KGG

<u>MEMORANDUM AND ORDER</u>

Plaintiff Nancy Little brings this action individually and as the personal representative of the estate of her father, Robert L. Rabe, against defendant The Budd Company. Plaintiff alleges that her father was exposed to asbestos-containing pipe insulation while working as a Pipefitter for the Atchison Topeka & Santa Fe Railroad ("ATSF") between 1951 and the mid-to-late 1970s. She contends that this exposure caused her father to develop asbestos-related malignant mesothelioma, causing his death on December 28, 2012.

Defendant allegedly manufactured passenger railcars and sold them to ATSF. Plaintiff contends that defendant placed asbestos and asbestos-containing products into its railcars, thereby exposing her father to asbestos during his employment with ATSF. Plaintiff asserts state law claims for negligence, strict product liability/design defect, and strict product liability/warning defect. Alternatively, plaintiff asserts a state law claim for negligence per se based on defendant's alleged violation of two federal statutes: (1) the Locomotive Inspection Act, and (2) the Federal Safety Appliance Act.

Defendant has filed a Motion for Summary Judgment (Doc. 71) seeking summary judgment against each of plaintiff's claims. Plaintiff has filed a Memorandum in Opposition (Doc. 81), and defendant has submitted a Reply (Doc. 90). Plaintiff also seeks a summary judgment ruling of her own. She has filed a Motion for Partial Summary Judgment (Doc. 73), asking the court to grant summary judgment in her favor on certain elements of her claims and against some of defendant's affirmative defenses. Defendant has submitted a Memorandum in Opposition (Doc. 78) to that motion, and plaintiff has submitted a Reply (Doc. 85).

After considering the parties' arguments, the court grants defendant's Motion for Summary Judgment in part and denies it in part. Also, it grants plaintiff's Motion for Partial Summary Judgment in part and denies it in part. The court explains why it made these decisions, below.[1]

## I.     Motion to Strike

Before turning to the parties' cross-motions for summary judgment, the court considers plaintiff's Objections to Portions of Defendant's Summary Judgment Evidence and Motion to Strike. Doc. 82. It asks the court to strike one paragraph of a Declaration that defendant submitted as support for its Motion for Summary Judgment. The Declaration is from Brian Bastien, defendant's President. Mr. Bastien declares that he has served as an officer of defendant since April 11, 2008, when he became the company's Treasurer. Since July 1, 2013, Mr. Bastien has served as its President.

---

[1]     Defendant has filed a Motion for Oral Argument on its Motion for Summary Judgment under D. Kan. Rule 7.2. Doc. 94. D. Kan. Rule 7.2 provides: "The court may set any motion for oral argument or hearing at the request of a party or on its own initiative." After reviewing the parties' written submissions, the court finds that they explain the parties' positions quite effectively. The court concludes that oral argument will not assist its work and thus, to allow it, would contradict Fed. R. Civ. P. 1. Exercising its discretion, the court denies defendant's request.

Mr. Bastien's Declaration explains that defendant made and sold thousands of passenger railcars from 1932 to 1987. So, by his own admission, Mr. Bastien did not start working for the company for some 20 years after it stopped manufacturing railcars. Mr. Bastien attests that the information provided in his Declaration is "true of my own personal knowledge except those matters stated on information and belief, and, as to those matters, [he] believe[s] them to be true." Doc. 72-1 at 1 (Bastien Decl. ¶ 1).

Specifically, plaintiff objects to paragraph 6 of Mr. Bastien's Declaration. Plaintiff asserts that Mr. Bastien's Declaration never reveals how he knows the information asserted in paragraph 6. Thus, plaintiff contends, Mr. Bastien bases the assertion on "information and belief"—and not his personal knowledge. Paragraph 6 of Mr. Bastien's Declaration reads:

> When the Budd passenger railcars were in use the steam came from a steam locomotive, a diesel locomotive equipped with a steam generator or a steam generator car if a steam generator-equipped locomotive was not available. The main steam lines of all the passenger cars in a train were designed to be, and were, connected to each other and to their power source, most usually the locomotive and most infrequently a steam generator car.

*Id.* at 2 (Bastien Decl. ¶ 6).

Defendant offers Mr. Bastien's assertion to support its affirmative defense based on a preemption theory. As the court discussed in an earlier Order denying defendant's Motion for Judgment on the Pleadings, the Locomotive Inspection Act ("LIA") prohibits state regulation of the "'design, the construction, and the material of every part of the locomotive and tender and of all appurtenances.'" *See* Doc. 61 at 9 (quoting *Napier v. Alt. Coast Line R.R. Co.*, 272 U.S. 605, 611 (1926)). On summary judgment, defendant argues that the LIA preempts plaintiff's claims here because they involve passenger railcars that "were designed to be, and were connected" to locomotives. Doc. 72-1 at 2 (Bastien Decl. ¶ 6).

Plaintiff argues that the court should strike this paragraph from the summary judgment record for three independent reasons: (1) defendant never disclosed Mr. Bastien under Fed. R. Civ. P. 26(a)(1)(A); (2) the information contained in paragraph 6 is not based on Mr. Bastien's personal knowledge; and (3) the information provided in paragraph 6 is inadmissible opinion evidence provided by a non-expert. As discussed below, the court excludes paragraph 6 of Mr. Bastien's Declaration for the first reason advanced by plaintiff—*i.e.*, defendant is precluded from offering this summary judgment evidence because it never identified Mr. Bastien under Rule 26(a)(1)(A). Because it decides plaintiff's motion on this basis, the court need not address plaintiff's two additional arguments seeking to exclude this summary judgment evidence.

Rule 26(a)(1)(A) requires a party to identify to the other party "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A). A party's failure to comply with Rule 26(a)(1)(A)'s disclosure requirements may preclude the party from offering an unidentified witness's testimony later in the proceedings. Federal Rule 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 631 (10th Cir. 2008) ("The exclusion of evidence presented out of time is automatic and mandatory unless the violation was either justified or harmless." (citation and internal quotation marks omitted)).

A district court has discretion to decide whether a Rule 26 violation is justified or harmless and, when doing so, should consider the following factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the

prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the

moving party's bad faith or willfulness." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th

Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993

(10th Cir. 1999)).

These factors favor excluding Mr. Bastien's Declaration under Rule 37.  First, plaintiff is

prejudiced and surprised by the Declaration.  Defendant never identified Mr. Bastien as a fact

witness, who could provide testimony to support defendant's affirmative defense based on LIA

preemption.  So, plaintiff contends, defendant denied her the opportunity to discover information

about Mr. Bastien's testimony.  This deprivation includes that option to take his deposition.  In

contrast, defendant asserts that plaintiff had ample notice of Mr. Bastien's testimony because

defendant identified him as its designated records custodian.  Also, Mr. Bastien verified

defendant's discovery responses.  According to defendant, plaintiff was well aware that

defendant intended to rely on ancient business records to support its defenses.  So, defendant

contends, plaintiff sustained no prejudice or surprise because she should have anticipated that

defendant's records custodian would provide testimony about those documents.  The court is

unpersuaded.

Typically, a records custodian just is responsible for keeping records in the ordinary

course of business.  *See, e.g.*, *Nat'l Jewish Health v. WebMD Health Servs. Grp., Inc.*, 305

F.R.D. 247, 255 (D. Colo. 2014) ("The purpose of a records custodian is to ensure the records'

'credibility, reliability, accessibility and ultimate disposition or destruction.'" (quoting The

Sedona Conference, *Best Practices Guidelines & Commentary for Managing Information &

Records in the Electronic Age*, cmt. 4.e, p. 34 (2d ed. Nov. 2007)); *Smith v. Dwire Co.*, No.

CIVA04CV02182WYD-OES, 2005 WL 3543058, at *3 (D. Colo. Dec. 27, 2005) ("[A] records

custodian's only purpose is to identify the records as having been kept in the regular course of business . . . ."); *Custodian of Evidence*, Black's Law Dictionary (10th ed. 2014) ("A custodian responsible for securing and controlling access to evidence and maintaining the evidence in exactly the condition it was in when received."). So, defendant's identification of Mr. Bastien as its records custodian could not have placed plaintiff on notice that defendant also intended for Mr. Bastien to provide substantive testimony about the content of defendant's business records. As plaintiff correctly asserts, defendant never disclosed the *nature* of Mr. Bastien's testimony— *i.e.*, that he would provide testimony supporting defendant's preemption affirmative defense. Defendant's omission surprised plaintiff, and now it has prejudiced her position in the action.

Defendant cites two cases to support its argument that its failure to disclose Mr. Bastien as a Rule 26(a)(1)(A) witness is not prejudicial, but instead harmless. The court finds neither one persuasive, at least not here. In the first case, the court found harmless a plaintiff's failure to identify a witness in her Rule 26 initial disclosure because plaintiff later identified the witness in her responses to defendant's interrogatories as someone who may have knowledge about plaintiff's allegations and who plaintiff may call as a witness at trial. *Taboas v. Fiddler, Gonzalez & Rodriguez, PSC*, 41 F. Supp. 3d 137, 143 (D.P.R. 2014). In contrast here, defendant never identified Mr. Bastien as a witness who may provide substantive testimony about one of defendant's affirmative defenses. Instead, defendant just identified him as a records custodian.

The second case held that a defendant's failure to identify a witness in its Rule 26 initial disclosures was harmless when plaintiff had a "fair and full opportunity" to depose a different witness on the same topic. *Curley v. Wells Fargo & Co.*, 120 F. Supp. 3d 992, 999–1000 (N.D. Cal. 2015). Here, defendant asserts, plaintiff had the opportunity to question defendant's Rule 30(b)(6) witness about its LIA preemption affirmative defense. So, defendant contends, plaintiff

sustained no prejudice. The court disagrees that plaintiff had the same "fair and full" opportunity to depose defendant's Rule 30(b)(6) witness on the same topic. Indeed, the testimony of defendant's Rule 30(b)(6) is markedly different than the assertion made by Mr. Bastien's Declaration. The Rule 30(b)(6) witness testified that he did not know whether defendant built its passenger railcars to comply with the federal requirements for locomotives. Doc. 91-3 at 8–9 (Bauer Dep. 168:24–169:2). Also, the Rule 30(b)(6) witness testified that he never spoke with Mr. Bastien about his deposition testimony and that he was not relying on any information provided by Mr. Bastien. *Id.* at 12 (Bauer Dep. 12:1–5). The court thus finds that plaintiff never had an opportunity to depose any witness about the assertion that Mr. Bastien now makes in his Declaration—*i.e.*, that defendant's passenger railcars "were designed to be, and were connected" to locomotives. Doc. 72-1 at 2 (Bastien Decl. ¶ 6). Defendant's nondisclosure thus surprised and prejudiced plaintiff.

Turning to the second factor, the court considers plaintiff's ability to cure the prejudice. Here, a cure would require reopening discovery proceedings and the summary judgment record. This second factor influences the third factor. Reopening discovery after both parties have moved for summary judgment and just a few months before trial will disrupt the proceedings. Finally, and though the record does not suggest that defendant acted willfully or in bad faith when it failed to identify Mr. Bastien in its Rule 26(a) initial disclosures, plaintiff asserts that Mr. Bastien—as defendant's President—was never an unknown witness. Also, defendant has asserted its preemption affirmative defense at the case's beginning—first raising the defense on November 2, 2016, when it filed its Answer. Doc. 6 at 6 (Answer ¶ 2 (Affirmative Defenses)). So, plaintiff argues, defendant's failure to identify Mr. Bastien as a witness is not justified.

After considering all four factors, the court concludes that they favor excluding paragraph 6 of Mr. Bastien's Declaration from the summary judgment record. Defendant's omission violated Rule 26(a)(1)(A), and it neither was substantially justified nor harmless. Thus, the court strikes this paragraph from Mr. Bastien's Declaration under Fed. R. Civ. P. 37(c)(1).

## II.    Motions for Summary Judgment

The court now turns to consider the parties' cross-motions for summary judgment.

### A.  Unconverted Facts

The following facts are either stipulated facts taken from the Pretrial Order (Doc. 68), or uncontroverted for purposes of the parties' summary judgment motions.

From 1951 until his retirement in 1994, Robert Rabe, worked for ATSF in its repair shops in Topeka, Kansas. From 1952 to 1981, Mr. Rabe worked as a Pipefitter and Sheet Metal Worker. One of his duties involved replacing pipe insulation on passenger railcars.

From 1932 to 1987, defendant manufactured and sold passenger railcars containing asbestos insulation to ATSF. ATSF repaired and renovated these passenger railcars during plaintiff's tenure working in the Topeka repair shops. Defendant's passenger railcars had a steam pipe running the length of the undercarriage. The steam pipe was wrapped with insulation containing asbestos.

During his employment, Mr. Rabe worked with and around the steam pipe insulation contained in defendant's passenger railcars. Also, Mr. Rabe worked with and around asbestos-containing insulted water pipes. These water pipes were not connected to the railcar's steam line. During his employment, Mr. Rabe also was exposed to dust from asbestos insulation removed from air conditioning pipes. In 2012, Mr. Rabe, was diagnosed with malignant mesothelioma. He died on December 29, 2012.

## B. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

The court applies this same standard to cross motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment sought by its motion. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). But where the cross motions overlap, the court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### C. Defendant's Motion for Summary Judgment

Defendant asserts two arguments supporting its Motion for Summary Judgment against plaintiff's claims. First, defendant argues that the Locomotive Inspection Act ("LIA") and the Federal Safety Appliance Act ("SAA") preempt plaintiff's state law claims for negligence, strict product liability/design defect, and strict product liability/warning defect. Second, defendant argues that plaintiff's alternative claim for negligence per se based on defendant's alleged violation of the two federal statutes (*i.e.*, the LIA and SAA) fails as a matter of law. The court addresses each of defendant's arguments, separately, below.

### 1. LIA and SAA Preemption

The Supremacy Clause of the United States Constitution confers on Congress the power to preempt state law. U.S. Const. art. VI, cl. 2. The clause provides that federal law is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Id.* "Pre-emption of state law thus occurs through the 'direct operation of the Supremacy Clause.'" *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012) (quoting *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Local 54*, 468 U.S. 491, 501 (1984)). The Supreme Court has explained that "Congress may, of course, expressly pre-empt state law, but '[e]ven without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances.'" *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). "First, 'state law is naturally preempted to the extent of any conflict with a federal statute.'" *Id.* (quoting *Crosby*, 530 U.S. at 372). Second, state law is pre-empted "'when the scope of a [federal] statute indicates that Congress intended federal law to occupy a field exclusively.'" *Id.* at 630–31 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

Here, defendant asserts the second type of preemption—called field preemption— applies, and it bars plaintiff's state law claims for negligence, strict product liability/design defect, and strict product liability/warning defect. Defendant bases its preemption defense on two distinct federal laws. First, defendant argues that Congress, when it enacted the LIA, intended for it to occupy the field of locomotives and their appurtenances. Defendant argues that the uncontroverted summary judgment facts establish that the equipment at issue here—*i.e.*, pipe insulation—is a locomotive appurtenance. And thus, defendant contends, the LIA preempts plaintiff's state law claims. Second, defendant makes an alternative preemption argument based

on the Federal Safety Appliance Act—the SAA. This argument contends that Congress intended for the SAA to occupy the field of safety equipment on railcars. Defendant asserts that the uncontroverted facts establish that pipe insulation is a safety appliance under the SAA. Thus, defendant contends, the SAA preempts plaintiff's state law claims based on the allegedly defective pipe insulation. The court considers defendant's arguments separately in part a and b, following.

### a. Locomotive Inspection Act Preemption

The Supreme Court has explained that the preemptive scope of the LIA "extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 631 (2012) (quoting *Napier v. Atl. Coast Line R.R. Co.*, 272 U.S. 605, 611 (1926)); *see also In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d 125, 131 (3d Cir. 2016) ("[F]ield preemption under the LIA turns on one fundamental question: is the state regulation or cause of action 'directed at the equipment of locomotives'?" (quoting *Kurns*, 565 U.S. at 635)).

Defendant argues that the LIA preempts plaintiff's state law claims here because the undisputed summary judgment facts establish that the allegedly defective equipment—*i.e.*, asbestos-containing pipe insulation—is a locomotive appurtenance. For support, defendant relies on Brian Bastien's Declaration. Specifically, defendant cites paragraph 6 of the Declaration where Mr. Bastien attests that the main steam lines of defendant's passenger rail cars were designed to connect to each other and their power source—"most usually" the locomotive and "most infrequently" a steam generator car. Doc. 72-1 at 2 (Bastien Decl. ¶ 6). As explained in Part I *supra*, the court has excluded the summary judgment evidence in Mr. Bastien's paragraph 6 because defendant never disclosed him as a witness as Rule 26(a) requires. But the court's

summary judgment decision isn't purely the product of its procedural conclusion under Rule 26. For even if defendant had established the same evidence offered in Mr. Bastien's paragraph 6 by a qualified witness, the court still would deny defendant's summary judgment motion.

This evidence, even if accepted as a summary judgment fact, doesn't establish that defendant's pipe insulation is a locomotive appurtenance as a matter of law. Indeed, even Mr. Bastien's Declaration concedes that locomotives didn't always supply the steam to the passenger railcars' steam lines. Mr. Bastien explains that the steam "came from a steam locomotive, a diesel locomotive equipped with a steam generator *or a steam generator car if a steam generator-equipped locomotive was not available*." *Id.* (emphasis added). And, while Mr. Bastien attests that the steam lines "most usually" were connected to the locomotive as the power source, Mr. Bastien also concedes that the power source sometimes was derived from "a steam generator car," albeit "most infrequently." *Id.*; *see also In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d at 131 (holding that genuine issues of fact existed whether the LIA preempted plaintiff's claims because plaintiff "attached in her opposition brief affidavit evidence from a former Railroad supervisor showing that, instead of being connected to locomotives, the pipes were connected to 'power cars' that separately supplied steam heat to the passenger coaches. She therefore established a genuine dispute of material fact precluding summary judgment.").

Defendant responds to this problem in the summary judgment facts by arguing that ATSF made a "post-purchase choice to manufacture and use" their own steam cars as the power source for the steam lines instead of a locomotive. Doc. 90 at 11. Defendant also argues that the summary judgment facts establish that ATSF never had more than six steam cars in use during a 20-year period when defendant manufactured more than 275 passenger railcars for ATSF. *Id.* at 13. From these facts, defendant contends, no triable issue exists whether defendant designed its

steam lines to use a steam car as a power source instead of a locomotive. The court cannot leap

to this conclusion on these summary judgment facts. Even if ATSF used no more than six steam

cars, this fact—viewed in plaintiff's favor—presents a triable issue whether defendant designed

its steam pipes to connect to steam cars as a power source and not merely locomotives. This is

especially true here because Mr. Bastien concedes that defendant designed the main steam lines

of all the passenger rail cars to connect to each other and their power source—which sometimes

(albeit "most infrequently") was a steam generator car, not a locomotive. Doc. 72-1 at 2 (Bastien

Decl. ¶ 6) (emphasis added).

Also, plaintiff offers other summary judgment evidence that creates a triable issue

whether the asbestos-containing pipe insulation is a locomotive appurtenance. Two former

ATSF employees—Dale Stout and Darrel Nimmo—attest by Affidavit that they often observed

passenger trains using steam generator cars—instead of the locomotive—as the steam source for

the steam pipes on passenger railcars.[2] Mr. Stout and Mr. Nimmo explain that when a steam

generator car was employed, it served as the power source for the passenger railcars' steam

pipes—not the locomotive. And, Mr. Nimmo attests, the steam generator cars and the

locomotive did not interconnect or function together to create steam or for any other reason.

Plaintiff also has submitted the Affidavit of Robert Elliott, Jr.—a former Amtrak

employee and railroad historian. Mr. Elliott attests that ATSF used steam generator cars as the

---

[2]     Defendant asserts that Mr. Stout merely identifies the use of steam generator cars starting in
1967—three years after defendant sold its last passenger railcar to ATSF. Doc. 90 at 16. This assertion
is, quite simply, incorrect. Mr. Stout's Affidavit doesn't limit the use of steam generator cars to this date.
While defendant doesn't say it explicitly, it appears that defendant's argument relies on the date shown on
one of two photographs attached to Mr. Stout's Affidavit. Doc. 81-8 at 4. One photograph shows a steam
generator car, and it is dated October 14, 1967. *Id.* But Mr. Stout's Affidavit explains that his testimony
is not confined to the date of the photograph, stating that both photographs show "typical Santa Fe steam
generator cars used at various times on the Santa Fe system on passenger trains during my employment."
*Id.* at 3 (Stout Aff. ¶ 8).

power source for passenger railcars' steam lines—both before and after Amtrak acquired the passenger railcars from ATSF. Mr. Elliott explains:

> Both before and after the establishment of Amtrak, steam generator cars were placed in trains as needed, like any other railcar on the passenger train. Steam generator cars had their own boiler fuel tanks, their own water tanks, and thereby functioned as a stand-alone source of steam for the passenger cars . . . Steam generator cars were not mechanically dependent on the locomotive and did not require a locomotive to function as intended.

Doc. 81-3 at 3 (Elliott Aff. ¶ 7).

Viewing the facts asserted in Mr. Stout, Mr. Nimmo, and Mr. Elliott's Affidavits in plaintiff's favor, they present a genuine issue whether defendant designed the passenger railcars' steam pipes to connect to the locomotive. Thus, the court cannot decide on summary judgment whether the asbestos-containing pipe insulation is a locomotive appurtenance.

Also, plaintiff asserts that her father was exposed not just to asbestos-containing insulation covering steam pipes but also to insulation covering water and air conditioning pipes present in defendant's passenger railcars. And plaintiff offers summary judgment facts presenting a triable issue whether the water and air conditioning pipes are locomotive appurtenances. Indeed, plaintiff has adduced admissible evidence that, if accredited by the jury, would establish that these water and air conditioning pipes never were connected to the steam lines or the locomotive. Instead, this evidence asserts, the water and air conditioning pipes were self-contained. *See* Doc. 81-3 at 4 (Elliott Aff. ¶ 13) ("Each passenger car's water lines were unique and self-contained to that car alone, and were not connected by any manner to the piping of any other car, nor to the locomotive."); *see also* Doc. 81-4 at 2 (Annis Aff. ¶ 4) ("Each [passenger railcar] had its own water tank and plumbing system. Some of the earlier cars from the 1940's had steam powered air conditioning, but the later cars all had electromechanical air conditioning. By the mid-1960's, we had converted all the cars to electromechanical air-

conditioning, so every car had its own stand-alone air-conditioning system and diesel generator which was not dependent on a source of steam.").

After a trial, plaintiff's evidence might or might not persuade the jury on this important issue. But, for now, the evidence suffices to create a genuine, triable issue whether the defective product that allegedly caused Mr. Rabe's death—*i.e.*, asbestos-containing pipe insulation—is a locomotive appurtenance. The court thus cannot decide on this summary judgment record whether the LIA preempts plaintiff's state law claims as a matter of law. The court thus denies defendant's Motion for Summary Judgment against plaintiff's state law claims based on LIA preemption.

### b. Federal Safety Appliance Act Preemption

Defendant next asserts that the SAA preempts plaintiff's state law claims. The SAA "govern[s] common carriers by railroad engaged in interstate commerce." *Gilvary v. Cuyahoga Valley Ry. Co.*, 292 U.S. 57, 60 (1934). It requires railroad carriers to equip railcars with listed safety features, including certain types of couplers, brakes, running boards, and handholds. 49 U.S.C. § 20302.

Defendant argues that the Supreme Court has held that states cannot regulate any railcar safety appliance whether "the appliance is listed in the SAA or not." Doc. 72 at 15. Defendant cites two Supreme Court cases to support this argument. First, in *Southern Railway v. Railroad Commission of Indiana*, the Supreme Court recognized that "Congress, of course, could have circumscribed its regulations so as to occupy a limited field . . . [b]ut so far as it did legislate, the exclusive effect of the [SAA] did not relate merely to details of the statute and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employees." 236 U.S. 439, 446 (1915). Second, in *Gilvary v. Cuyahoga Valley*

*Railway Co.*, the Court held: "So far as the safety equipment of such vehicles is concerned, [the SAA] operate[s] to exclude state regulation whether consistent, complementary, additional, or otherwise." 292 U.S. at 60–61.

Neither of these cases explicitly holds that SAA preemption extends to all safety appliances whether the statute specifically lists them or not, as defendant asserts. And, in other SAA cases, the Supreme Court has suggested that SAA preemption is limited to just those safety appliances listed in the act. *See, e.g., Napier v. Atl. Coast Line R.R. Co.*, 272 U.S. 605, 611 (1926) ("Does the legislation of Congress manifest the intention to occupy the entire field of regulating locomotive equipment? *Obviously it did not do so by the Safety Appliance Act, since its requirements are specific.*" (emphasis added)); *Atl. Coast Line R.R. Co. v. Georgia*, 234 U.S. 280 (1914) (holding that SAA did not preempt a Georgia statute requiring headlights on locomotives because "it does not appear . . . either that Congress has acted, or that the Commission, under the authority of Congress, has established any regulation so far as headlights are concerned").

Plaintiff argues that the court already held in its Order denying defendant's Motion for Judgment on the Pleadings "that SAA's preemptive reach encompasses only designated 'safety appliances,'" and "this Court has already ruled that the alleged instrument of harm (pipe insulation) is not a statutory appliance as a matter of law." Doc. 81 at 35. Plaintiff reads too much into the court's earlier Order. In that Order, the court addressed defendant's argument that the SAA preempts the entire field of railway equipment. Doc. 61 at 14. The court cited Judge Brown's decision in *Garay v. Missouri Pacific Railroad Co.*, 38 F. Supp. 2d 892 (D. Kan. 1999), to emphasize that our court previously has refused to find that the SAA preempts the entire field of railway equipment. *Id.* at 15. Just the opposite, Judge Brown held that "'the [SAA] does not

subsume the entire field of devices which could be deemed safety equipment, but only the subject of those devices which are listed in the statute.'"  Doc. 61 at 16 (quoting *Garay v. Mo. Pac. R.R. Co.*, 38 F. Supp. 2d 892, 898 (D. Kan. 1999)).  The court did not apply *Garay*'s rule to plaintiff's claims at the pleading stage—*i.e.*, the rule holding that the SAA preempts "only the subject of those devices which are listed in the statute."  *Garay*, 38 F. Supp. 2d at 898.  Indeed, the court recognized that *Garay* was not controlling authority.  *Id.* at 16–17.  Nevertheless, it found Judge Brown's *Garay* opinion consistent with *Southern Railway*—at least in the context of the question presented, *i.e.*, whether the SAA preempts the entire field of railway equipment— because both cases hold that that SAA does not impose preemption as broadly as defendant had suggested—extending it to all railway equipment—but instead found that the SAA preempts state regulation of "safety appliances."

But the court now returns to the question on summary judgment because plaintiff asserts it here:  Is the preemptive scope of the SAA limited to the safety appliances specifically listed in the statute?  Or does the SAA preempt regulation of the entire field of safety appliances?  Our Circuit has explained that "[f]ield preemption occurs when a 'state law . . . regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.'"  *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324–25 (10th Cir. 2010) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990)).  "Congress's intent for federal law to occupy a field exclusively 'may be inferred from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Id.* at 1325 (quoting *English*, 496 U.S. at 79).

Here, the court cannot conclude that Congress's regulation under the SAA is "so pervasive" that the court must infer that Congress intended to occupy the entire field of safety equipment. Indeed, the statute "contains a strikingly specific laundry list of equipment a railroad must have on each type of car: ladders, brakes, automatic couplers, hand holds, running boards, etc." *Jordan v. So. Ry. Co.*, 970 F.2d 1350 (4th Cir. 1992) (citation omitted).[3] If Congress had intended for the SAA to occupy the field of safety appliances, one would expect it to have defined "safety appliances" broadly. But Congress didn't do so; instead, it confined the SAA to a specific list of equipment.

Also, a decision that the SAA preempts the entire field of all safety appliances—and not just those listed in the statute—appears to conflict with the Supreme Court's decision in *Atlantic Coast Line Railroad Co. v. Georgia*. In that case, the Supreme Court held that the SAA did not preempt a Georgia statute requiring the use of headlights on locomotives. 234 U.S. 287, 293–94 (1914). The Court recognized "Congress [had] acted" by enacting federal statutes governing certain locomotive equipment and providing for the investigation and report "on the need of any appliances or systems intended to promote the safety of railway operations." *Id.* at 293. Specifically, the statutes required the use of "power driving-wheel brakes for locomotives, grab irons, automatic couplers, and height of drawbars . . . sill steps, hand brakes, ladders, running boards, and hand holds." *Id.* But "none of these acts provides regulations for locomotive headlights." *Id.* So, according to the Supreme Court, "it [did] not appear . . . either that

---

[3]     The court recognizes that *Jordan* involved a plaintiff asserting a Federal Employers' Liability Act ("FELA") claim. *Jordan*, 970 F.2d at 1352. FELA imposes strict liability when a plaintiff's injury results from a malfunction of safety equipment required by the SAA. *Id.* The *Jordan* plaintiff asserted that he had sustained injury when he attempted to use a ratchet mechanism to open a door to a ballast car. *Id.* The Fourth Circuit held that the "absence of a device from" the SAA's list of safety appliances "is fatal" to a claim asserting strict liability under FELA. *Id.* at 1354. And because the SAA does not include a ratchet mechanism as a safety appliance, the court held, the railroad was not strictly liable for its malfunction. *Id.* The court realizes that *Jordan* never addresses preemption. But it nonetheless provides a succinct summary of the types of safety equipment the SAA specifically requires.

Congress [had] acted, or that the Commission, under the authority of Congress, [had] established any regulation so far as headlights are concerned." *Id*. And, because "the situation [had] not been altered by any exertion of Federal power," the Court held that the SAA did not preempt the Georgia statute requiring headlights on locomotives. *Id.* at 293–94. In reaching this conclusion, the Court specifically examined the list of safety appliances regulated by federal law and concluded that the SAA did not preempt the Georgia statute because the federal act never addressed headlights. The Court's analysis never considered whether headlights are a "safety appliance" falling within a field that Congress intended to occupy when it enacted the SAA. Instead, the Court confined its analysis to the statutory language codified by Congress.

The court recognizes that the Supreme Court also used more sweeping language in *Southern Railway* to describe the scope of the SAA's preemption. *See So. Ry.*, 236 U.S. at 446 (holding that the SAA "extend[s] to the whole subject of equipping cars with appliances intended for the protection of employees"). But *Southern Railway* decided whether the SAA preempted an Indiana statute requiring railway companies to place secure grab irons and hand holds on the sides or ends of every railroad car. *Id.* at 444. The Court decided that the Indiana law regulated the same subject matter specifically regulated by the SAA: "The Indiana law requires hand holds on sides *or* ends of cars, while the Federal statute requires hand holds to be placed both on the sides *and* ends of cars." *Id.* at 448. The Court thus found "that Congress has so far occupied the field of legislation relating to the equipment of freight cars with safety appliances as to supersede existing and prevent further legislation *on that subject*." *Id.* at 447 (emphasis added). So, *Southern Railway* held, the SAA preempted the particular Indiana statute at issue there. *Id.* at 448.

Other Supreme Court and Circuit decisions likewise have applied SAA preemption when the state regulation involves a safety appliance specifically listed in the SAA's federal regulations. *See, e.g.*, *Pa. R.R. Co. v. Pub. Serv. Comm'n*, 250 U.S. 566, 569 (1919) (holding that a Pennsylvania statute could not impose additional requirements for equipping railcars with platforms because the SAA "with its careful requirements for . . . safety" and the "most elaborate regulations issued by the Interstate Commerce Commission" governed that subject exclusively); *Union Pac. R.R. Co. v. Cal. Pub. Util. Comm'n*, 346 F.3d 851, 870 (9th Cir. 2003) (holding that a state's safety regulation governing use of couplers—a safety appliance specifically listed in the SAA's statutory language—was preempted by the SAA); *cf. Ouellette v. Union Tank Car Co.*, 902 F. Supp. 5, 10 (D. Mass. 1995) (holding that the Federal Railroad Safety Act and the SAA preempted plaintiff's state law products liability claims based on an ill-placed handhold because the federal regulations specifically govern placement of handholds on railcars). But defendant does not cite any Supreme Court decision applying SAA preemption to a state law claim based on a device that the SAA does not list specifically in the statute but otherwise falls within the broader definition of "safety appliance." And the court's research did not locate such a case. Without such authority, the court declines to expand SAA preemption as broadly as defendant does.

Finally, although Judge Brown's opinion in *Garay* is not controlling authority, the court finds his well-reasoned opinion persuasive and applies it here. Considering the Supreme Court authority that the court already has discussed, Judge Brown held that the SAA "does not subsume the entire field of devices which could be deemed safety equipment, but only the subject of those devices which are listed in the statute." 38 F. Supp. 2d at 898. And, because the SAA "does not list devices such as lanyard attachment points or grates on hopper cars," Judge

Brown concluded that the SAA did not preempt plaintiffs' state law defect and negligence claims premised on defendant's alleged failure to equip a hopper car with those devices. *Id.* At least one other court has reached a similar conclusion. *See Milesco v. Norfolk S. Corp.*, 807 F. Supp. 2d 214, 223 (M.D. Pa. 2011) (holding that the SAA did not preempt plaintiff's negligence and products liability claims stemming from his accident involving a cushion unit because defendants "fail[ed] to explain where in the SAA the dismantling and discarding of a cushion unit is regulated").

Likewise here, the court concludes that Congress did not intend to occupy the entire field of railcar safety appliances when it enacted the SAA. Instead, the court concludes, Congress just intended to regulate "the subject of those devices that are listed in the statute." *Garay*, 38 F. Supp. 2d at 898. Plaintiff's state law claims here rest on her father's exposure to asbestos-containing pipe insulation. The SAA never lists pipe insulation as one of the safety features that railroad carriers must attach to their railcars.[4] The court thus holds that the SAA does not preempt plaintiff's state law claims based on asbestos-containing pipe insulation. And the court denies defendant's Motion for Summary Judgment against plaintiff's state law claims based on SAA preemption.

In her Opposition to defendant's Motion for Summary Judgment, plaintiff asks the court to reverse the issue presented by defendant's motion and hold, instead, that plaintiff deserves summary judgment in her favor. Even though she is the non-movant, plaintiff contends that the summary judgment facts viewed in defendant's favor establish that the SAA does not preempt her claims. Doc. 81 at 40–45. For support, plaintiff cites two subsections of Rule 56(f). Rule 56(f)(1) permits a district court to "grant summary judgment for a nonmovant." Fed. R. Civ. P.

---

[4] Defendant even concedes that "[p]ipe insulation is not listed as a required safety appliance in the SAA." Doc. 72 at 18.

56(f)(1).  And Rule 56(f)(3) allows a district court to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."  Fed. R. Civ. P. 56(f)(3).  But both subsections of this Rule require the court to "giv[e] notice and a reasonable time to respond."  Fed. R. Civ. P. 56(f); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150 (10th Cir. 2017) ("[T]hough we generally don't favor the granting of summary judgment sua sponte, a district court may do so if the losing party was on notice that she had to come forward with all of her evidence." (citation and internal quotation marks omitted)).

Here, the court has provided no notice to defendant that it may consider granting summary judgment sua sponte against defendant's SAA preemption theory.  Neither did plaintiff.  She elected not to raise this issue in her summary judgment motion.  Because both parties have had the opportunity to brief the scope of SAA preemption, and the material facts germane to this issue seem undisputed, it's likely defendant would sustain no prejudice from the absence of notice.  *See Oldham*, 871 F.3d at 1150 (explaining that even if Rule 56(f) "notice is lacking, we will still affirm a grant of summary judgment if the losing party suffered no prejudice from the lack of notice.  If such prejudice is shown, however, then we will reverse." (citation and internal quotation marks omitted)).

Nevertheless, the court declines plaintiff's invitation to grant summary judgment sua sponte against defendant's affirmative defense based on its SAA preemption theory.  By deferring this ruling to trial, the court provides defendant sufficient notice and an opportunity to address plaintiff's argument that defendant's SAA preemption theory fails as a matter of law.

Also, the court's summary judgment ruling on defendant's LIA preemption theory leaves this issue for trial. The court can address both preemption theories on a full trial record, giving both parties notice and opportunity to present their arguments in the context of the trial evidence.

### 2. Alternative Claim Based on Federal Law Violations

Plaintiff asserts an alternative claim of negligence per se claim under Kansas law. This claim alleges that defendant violated the standards promulgated by the LIA and SAA. Although plaintiff specifically denies that these two federal statutes preempt her state law claims, she seeks to assert an alternative state law claim based on defendant's alleged violation of the LIA and SAA, if the court finds that the two federal statutes preempt her other state law claims.[5]

Defendant asserts several reasons why plaintiff's alternative claim fails as a matter of law. First, defendant asserts, although the equipment that injured plaintiff's father falls within the field preempted by the LIA and SAA, these two federal statutes never specifically regulate pipe insulation. So, defendant contends, the LIA and SAA do not impose a federal standard of care, as required by plaintiff's alternative claim. Second, defendant argues, even if the two federal statutes regulated pipe insulation, neither statute applied to manufacturers—like defendant—when plaintiff's father allegedly was exposed to asbestos-containing pipe insulation.

In its Motion for Judgment on the Pleadings, defendant argued that plaintiff cannot state a claim based on LIA or SAA violations because those statutes apply only to "railroad carriers" and not to suppliers or manufacturers of passenger railcars like defendant. Doc. 61 at 21 (first

---

[5] The court is ruling whether plaintiff's alternative claim survives summary judgment because defendant has presented the issue in its summary judgment motion. But, if plaintiff's other three state law claims survive defendant's preemption affirmative defenses at trial, plaintiff's alternative claim appears moot. Plaintiff asserts in the Pretrial Order: "If the issue of federal preemption is ultimately resolved in Plaintiff's favor following Defendant's anticipated Motion for Summary Judgment, then the alternative cause of action will be voluntarily dismissed." Doc. 68 at 13; *see also* Doc. 81 at 43 ("[I]f the court denies [defendant's] preemption motion now, plaintiff's fourth cause of action will be withdrawn as moot . . . because implicit in that ruling is the finding that LIA/SAA never provided a federal standard of care.").

citing 49 U.S.C. § 20701 (LIA); then citing 49 U.S.C. § 20302(a) (SAA)).  The court's ruling

recognized, however, that "the LIA and SAA share a common penalty provision that allows the

imposition of fines up to $100,000 on any 'person' who violates the acts."  *Id.* (quoting 49

U.S.C. § 21301(a)); *see also* 49 U.S.C. § 21302(a) (imposing penalties on any "person"

"violating chapters 203–209 of this title or a regulation or requirement prescribed or order issued

under chapters 203–209").  "And, the governing regulations provide that the statute's use of

'person' includes 'any . . . manufacturer' of railroad equipment who is subject to penalties for

violating the acts."  *Id.* (first quoting 49 C.F.R. § 229.7 (LIA); then quoting 49 C.F.R. § 231.0(f)

(SAA)).  Because the LIA and SAA penalty provision applies to manufacturers like defendant

here, the court denied defendant's Motion for Judgment on the Pleadings.

But on summary judgment, defendant argues for the first time that Congress did not enact

the statutes' penalty provision until 1988.  *See* An Act To Amend the Federal Railroad Safety

Act of 1970 and For Other Purposes., Pub. L. No. 100-342, 102 Stat. 624, 630–633 (1988).[6]  And

thus, defendant contends, the court cannot apply the statutes retroactively to impose a standard of

care on defendant.

"The retroactivity of a statute is a question of law . . . ."  *Valdez-Sanchez v. Gonzales*, 485

F.3d 1084, 1088 (10th Cir. 2007) (citation omitted).  In *Landgraf v. USI Film Products*, 511 U.S.

244 (1994), the Supreme Court "established a two-part test for determining whether a statute

applies retroactively."  *Valdez-Sanchez*, 485 F.3d at 1088.  "First, we ask whether Congress

expressed its intentions as to the temporal reach of the statute."  *Id.* (citing *Landgraf*, 511 U.S. at

280).  "If we cannot ascertain congressional intent, we move to the second step of the *Landgraf*

analysis and consider whether the statute has a retroactive effect."  *Id.* (citing *Landgraf*, 511 U.S.

---

[6]     Plaintiff never disputes that Congress amended the statutes to include the penalty provision in
1988.

at 280). "A statutory provision has a 'retroactive effect' when its application impairs rights a party possessed when he acted, increases a party's liability for past conduct, or imposes new duties or new disabilities with respect to transactions already completed." *Id.* (citing *Landgraf*, 511 U.S. at 280 (further citation omitted)). "If application of the statute creates a retroactive effect, 'our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.'" *Id.* (quoting *Landgraf*, 511 U.S. at 280).

Applying the first step here, the statute includes no language defining its temporal reach. So, moving to *Landgraf*'s second step, the court considers whether the statute has a retroactive effect. It does. Imposing the penalty provision on defendant would increase its liability for past conduct. It is undisputed that plaintiff's father worked as a pipefitter on defendant's passenger railcars between 1951 and 1981. *See* Doc. 81 at 11 (Pl.'s Designation of Additional Undisputed Material Facts ¶ 1). During that time, the LIA and SAA applied only to railroads—and not manufacturers like defendant. Thus, if the court applied the penalty provision here, it would do so retroactively, making defendant liable for past conduct. Under these circumstances, the court presumes that the statute does not apply unless Congress expressed a clear intent for retroactive application. No clear intent exists here. The court thus declines to apply the LIA and SAA retroactively here.

Plaintiff responds to defendant's argument, asserting that her cause of action did not accrue until her father was diagnosed with mesothelioma and died in 2012—after Congress amended the statute to include manufacturers in the penalty provision. But plaintiff's argument still requires the court to apply the amendments retroactively. Plaintiff's claim may have accrued in 2012, when she first learned a cause of action might exist. But her claim seeks to impose liability for asbestos exposure that occurred when her father was working on defendant's

passenger rail cars.  Because it is undisputed that plaintiff's father stopped working as a pipefitter on passenger railcars in 1981, plaintiff seeks to impose the penalty provisions on defendant for conduct that occurred at least 37 years ago.  In short, defendant's conduct occurred long before Congress amended the LIA and SAA to include the penalty provisions.  The court declines to apply the penalty provisions retroactively here.

For this reason, the court grants summary judgment against plaintiff's negligence per se claim premised on defendant's violation of the LIA and SAA.  Because the two statutes did not apply to manufacturers when plaintiff's father allegedly was exposed to asbestos-containing pipe insulation, the court cannot apply the standards contained in those statutes retroactively to impose liability on defendant in the form of a state law claim for negligence per se.

### D.  Plaintiff's Motion for Partial Summary Judgment

The court now turns to plaintiff's Motion for Partial Summary Judgment.  Plaintiff seeks summary judgment:  (1) in her favor on the issue whether asbestos exposure caused her father (Mr. Rabe) to contract mesothelioma; (2) against defendant's affirmative defense that Mr. Rabe contributed to the cause of his damages; and (3) against defendant's affirmative defense that concurrent and successive exposures to asbestos caused Mr. Rabe's injuries.

In defendant's Memorandum in Response and Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 78), defendant asserts that it does not contest that Mr. Rabe was diagnosed with mesothelioma and that asbestos exposure caused him to contract the disease.  *Id.* at 13.  The court thus grants summary judgment for plaintiff on the first issue presented by plaintiff's motion.

Defendant's Memorandum also withdraws its affirmative defense that Mr. Rabe contributed to the cause of his mesothelioma.  *Id.*  Defendant agrees that Mr. Rabe's smoking did

not cause his mesothelioma. *Id.* But defendant explains that it nonetheless reserves the right to present evidence of Mr. Rabe's 40-year smoking history at trial because, defendant contends, this evidence is relevant to his medical condition, life expectancy, and whether he would have followed adequate safety warnings. Plaintiff responds that the admissibility of her father's smoking history is an issue that the court need not address until the evidence is offered at trial. The court agrees. The court thus declines to decide now whether defendant can introduce evidence of Mr. Rabe's smoking history at trial. But it grants summary judgment against defendant's affirmative defense that Mr. Rabe contributed to the cause of his mesothelioma.

Thus, the only summary judgment issue remaining from plaintiff's motion is the third issue it raises—*i.e.*, whether the summary judgment facts present a triable issue about defendant's defense that other exposures to asbestos caused Mr. Rabe to contract mesothelioma. Plaintiff asserts that the summary judgment record contains no evidence that Mr. Rabe's other exposures to asbestos were a substantial contributing factor to the cause of his death. The controlling cases permit defendant to present a reasonable inference that exposure to another product was a substantial contributing factor to Mr. Rabe's injuries if it comes forward with "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where [Mr. Rabe] actually worked." *Dillon v. Fibreboard Corp.*, 919 F.2d 1488, 1491 (10th Cir. 1990) (citing *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1163 (4th Cir. 1986)); *see also Lyons v. Garlock, Inc.*, 12 F. Supp. 2d 1226, 1229 (D. Kan. 1998) (applying the *Dillon* standard to determine whether plaintiff had met her burden to prove causation). Defendant has adduced admissible evidence sufficient to establish a genuine issue whether other asbestos exposure contributed to Mr. Rabe's death. As the next paragraph explains, defendant has met its summary judgment burden on this issue.

Defendant submitted interrogatory responses that Mr. Rabe verified in a lawsuit he filed against ATSF in 1990 for injuries based on asbestos exposures. In those interrogatory responses, Mr. Rabe identified each asbestos product to which he was exposed during his employment by ATSF. His interrogatory responses describe asbestos-containing pipe insulation—presumably the same product at issue in this case. But they also describe several other sources of asbestos exposure. They include valve packing, gloves, and solid sheets used to make hot pads. Also, defendant has presented Affidavits that Mr. Rabe submitted to several asbestos bankruptcy trusts in 2012.[7] In those 11 Affidavits, Mr. Rabe swore that he had at least six months' worth of exposure to various asbestos-containing products other than pipe insulation. Doc. 78-5. The summary judgment evidence also includes the deposition testimony of Jim Shaw, one of Mr. Rabe's former co-workers. Mr. Shaw testified that he believes that both he and Mr. Rabe were

---

[7]     Plaintiff asks the court to strike this summary judgment evidence. Plaintiff contends the Affidavits contain information "provided, as required, during the asbestos bankruptcy trust settlement negotiation and process," and thus the evidence is inadmissible under Fed. R. Evid. 408(a)(2). Doc. 85 at 2; *see also* Fed. R. Evid. 408(a)(2) (explaining that evidence of "conduct or a statement made during compromise negotiations about the claim" is not admissible "to prove or disprove the validity or amount of a disputed claim"). Plaintiff also asserts that the Affidavits are not relevant.

Other federal courts have considered and specifically rejected plaintiff's arguments. *See, e.g.*, *Ferguson v. Lorillard Tobacco Co., Inc.*, No. 09-91161, 2011 WL 5903624, at *1 (E.D. Pa. Nov. 22, 2011) (ordering plaintiff to produce documents "relating to other claims submitted by Plaintiff to recover compensation for asbestos-related injuries, including claims submitted to bankruptcy trusts" because "although settlement discussions and offers of compromise are not discoverable, a defendant is entitled to discover claims to recover for asbestos-related injuries that a plaintiff has submitted"); *Shepherd v. Pneumo-Abex, LLC*, No. 09-91428, 2010 WL 3431633, at *2 (E.D. Pa. Aug. 30, 2010) (holding that "a claim made to a bankruptcy trust is more analogous to a complaint than an offer of settlement or compromise" and thus "Rule 408 does not bar production of certain information contained in the claim"); *see also Carroll v. John Crane Inc.*, No. 15-cv-373-wmc, 2017 WL 2912720, at *2 (W.D. Wis. July 7, 2017) (denying a motion in limine that sought to exclude "any claims plaintiffs have submitted to bankruptcy trusts" because "any claims plaintiffs have asserted that other entities are responsible for the development of Mr. Carroll's mesothelioma are potentially relevant both for purposes of deciding causation and damages").

The court rejects plaintiff's arguments here for the same reasons. The Affidavits do not contain any information about settlement amounts or offers to compromise. Thus, Fed. R. Evid. 408 does not bar their admission. Also, Mr. Rabe's descriptions of his other exposures to asbestos-containing products appear relevant to determining causation and damages questions. So, the court considers the Affidavits on summary judgment.

exposed to asbestos from pipe insulation installed inside ATSF's buildings and from cement insulation mixed in buckets that created a significant amount of dust.

Defendant also asserts that plaintiff's experts have conceded that other asbestos exposures contributed to Mr. Rabe's mesothelioma. Plaintiff's pathologist expert, Dr. Victor Roggli, testified that he could not discount other asbestos exposures—at least not the three products he was questioned about during his deposition—as contributing causes of Mr. Rabe's mesothelioma. Also, another of plaintiff's medical experts, Dr. Arthur Frank, opines that "[t]he cumulative exposures that [Mr. Rabe] had to asbestos, *from any and all products*, containing any and all fiber types, would have contributed to his developing" his asbestos-related disease. Doc. 78-7 at 1. Thus, Dr. Frank recognizes that other sources of asbestos—not just pipe insulation— could have contributed to Mr. Rabe's mesothelioma.

Viewing these facts in the light most favorable to defendant, a reasonable jury could conclude that exposure to other asbestos-containing products—and not just defendant's asbestos-containing pipe insulation—were a substantial contributing factor to Mr. Rabe's death. The court thus denies plaintiff's Motion for Partial Summary Judgment against defendant's affirmative defense that asserts other asbestos exposures caused Mr. Rabe to contract mesothelioma.

In a final argument, plaintiff asserts that defendant cannot argue that other manufacturers caused Mr. Rabe's mesothelioma when it never disclosed these third-parties as parties responsible for plaintiff's damages. Defendant argues that the court should not consider plaintiff's argument because she has raised it improperly in her Reply. *See Liebau v. Columbia Cas. Co.*, 176 F. Supp. 2d 1236, 1244 (D. Kan. 2001) ("Courts in this district generally refuse to consider issues raised for the first time in a reply brief" (citations omitted)). But, even

considering plaintiff's argument, the court isn't persuaded by it. Defendant's affirmative defense doesn't try to shift liability to other parties. Instead, the affirmative defense allows defendant to try to persuade the jury that it is not responsible for causing Mr. Rabe's mesothelioma because other products—not just the asbestos-containing pipe insulation in defendant's passenger railcars—could have contributed to causing Mr. Rabe's death.

### III.      Conclusion

For reasons explained, the court grants defendant's Motion for Summary Judgment in part and denies it in part. The court grants defendant's Motion for Summary Judgment against plaintiff's fourth cause of action—*i.e.*, her alternative claim of negligence per se under Kansas law premised on an alleged violation of the standards of care promulgated by the LIA and SAA. The court denies defendant's Motion for Summary Judgment against plaintiff's state law claims based on either LIA or SAA preemption.

Also, the court grants plaintiff's Motion for Partial Summary Judgment in part and denies it in part. The court grants summary judgment for plaintiff on the question whether asbestos exposure caused Mr. Rabe to contract mesothelioma. Also, the court grants summary judgment against defendant's affirmative defense that Mr. Rabe contributed to the cause of his damages. But the court denies plaintiff's motion for summary judgment against defendant's affirmative defense that other concurrent and successive exposure to asbestos caused Mr. Rabe's injuries.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 71) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Partial Summary Judgment (Doc. 73) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion to Strike (Doc. 82) is granted.

**IT IS FURTHER ORDERED THAT** defendant's Motion for Oral Argument (Doc. 94)

is denied.

**IT IS SO ORDERED.**

**Dated this 10th day of September, 2018, at Kansas City, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**